**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

SANDRA MEENTS,                               Case No. 1:13-cv-457
    Plaintiff,                           Litkovitz, M.J.

    vs.

BEECHWOOD HOME,                              **ORDER**
    Defendant.

This matter is before the Court on defendant Beechwood Home's motion for summary

judgment (Doc. 16), plaintiff's response in opposition to defendant's motion (Doc. 24), and

defendant's reply memorandum in support of the motion (Doc. 26).

**I. Background**

Plaintiff Sandra Meents brings this action under the Family and Medical Leave Act

(FMLA), 29 U.S.C. § 2601, *et seq*., against defendant Beechwood Home ("Beechwood"), her

former employer.  Plaintiff alleges in the complaint that she was employed by Beechwood for 27

years, during which time she received positive performance evaluations and regular pay raises.

(Doc. 1).  Plaintiff alleges that in February 2012, she began taking FMLA leave related to the

care of her husband, who was suffering from congestive heart failure which ultimately led to his

death in October 2012.  (*Id*.).  Plaintiff alleges she took intermittent FMLA leave days between

February and May 2012 to care for her husband and for herself due to a back injury she had

sustained while lifting her husband.  (*Id*.).  Plaintiff alleges that on May 15, 2012, she requested

to take FMLA leave on May 17, 2012, but her request was denied because she had not accrued

sufficient time off.  (*Id*.).  Plaintiff alleges that later on May 15, 2012, defendant ordered her to

be tested for alcohol, even through there was no reasonable suspicion to believe she was in

violation of defendant's alcohol policy which was then in effect.  (*Id*.).  Plaintiff alleges that

defendant did not comply with the testing procedures established in its published policy, and her test result did not meet the cut-off for a positive test result under that policy. (*Id.*). Plaintiff alleges that defendant nonetheless discharged her for ostensibly failing the test, which was a pretext for retaliation for using FMLA leave during 2012. (*Id.*). Based on these allegations plaintiff brings a claim for unlawful retaliation under the FMLA, alleging that defendant discharged her for exercising her rights under the FMLA.[1] (*Id.*).

## II. Facts

The facts set forth below are undisputed, except where otherwise noted.

### A. Beechwood Personnel

Plaintiff was employed by Beechwood as an LPN from August 1984 until she was terminated on May 15, 2012. (Doc. 17-1, Meents Depo. at 19-20).[2] Plaintiff was supervised during the relevant time period by Esther Antwi-Bokaye, an RN and LPN supervisor who began her employment with Beechwood in 2009. (Doc. 20-1, Antwi-Bokaye Aff., ¶¶ 1, 2). Antwi-Bokaye's supervisor was Belinda Rose, Beechwood's Director of Nursing. (*Id.*, ¶ 3). Angie Zwick (fka "Angie Strunk") worked as a Human Resources (HR) consultant to Beechwood from approximately January 2010 or 2011 until April 2013, though she was employed by a separate entity known as Sheakley. (Doc. 18-1, Zwick Aff., ¶¶ 1, 2). Zwick was the HR Director at Beechwood and had an office there. (*Id.*, ¶ 3). She created employee policies for Beechwood. (*Id.*, ¶ 4). Linda Senior was the HR Assistant at all relevant times and Rachel Bock did the scheduling for LPNs. (Doc. 17-1, Meents Depo. at 66, 105).

---

[1] Defendant construes certain allegations in the complaint as possibly stating a separate claim for FMLA interference. (Doc. 16 at 16-17). However, as plaintiff has clarified in her memorandum in opposition to the motion for summary judgment, she brings a claim only for FMLA retaliation. (Doc. 24 at 11-12).

[2] The parties reference other depositions, but plaintiff's deposition is the only deposition that has been filed with the Court. As the other depositions have not been made part of the record on summary judgment, the Court has disregarded all other deposition testimony cited by the parties in ruling on the summary judgment motion.

2

**B. Beechwood's FMLA leave policy**

Plaintiff understood that in accordance with the terms of the FMLA, she was entitled to 12 weeks of FMLA leave each year while employed at Beechwood. (Doc. 17-1, Meents Depo. at 47). Plaintiff used PTO (paid time off) hours for FMLA leave. (*Id*. at 47-48). Beechwood's employee handbook provided that "if an employee has accrued paid leave . . ., the employee may use any qualifying paid leave" before using FMLA leave. (Doc. 24-11, p. 53). "Qualifying paid leave" is defined in the employee handbook as "leave that would otherwise be available to the employee for the purpose for which the FMLA leave is taken." (*Id*.).

Beechwood did not have a special form that its nurses used to request FMLA leave. (Doc. 25, Meents Aff., ¶ 7). Plaintiff asserts that she used a "Request for Paid Time Off" form to request FMLA leave, and she was not asked for justification for the FMLA leave. (*Id*.; Doc. 17-2, Meents Depo. at 106-09). According to Antwi-Bokaye, if a nurse wanted to call in and use FMLA time, the only requirement was that the nurse call Antwi-Bokaye and inform her of the request. (Doc. 21-1, Antwi-Bokaye Aff., ¶ 4). Antwi-Bokaye would then write the request on a "call off card" and submit the card to Human Resources. (*Id*., ¶ 4). The nurse was not required to tell Antwi-Bokaye the reason for the FMLA leave. (*Id*.). According to Antwi-Bokaye, Beechwood uses an outside agency to supply nurses to fill in for a Beechwood nurse who is off work for any reason, which is a very common occurrence. (*Id*., ¶ 8).

**C. Plaintiff's FMLA leave history**

Plaintiff had taken intermittent FMLA leave over the course of several years while employed at Beechwood. (Doc. 17-2, Meents Depo. at 70). In February 2012, plaintiff's husband started having more severe health issues and plaintiff injured her back helping him after he collapsed on February 24, 2012. (Doc. 25, Meents Aff., ¶ 5). As a result of her injury and to

3

help care for her husband, plaintiff believes she took FMLA leave on February 25, 26, 28, and 29 and on March 1, 2 and 8, 2012. (*Id.*, ¶ 6). Plaintiff believes she took April 21, 22, 24, 25, 26 and 27, 2012 as FMLA days to transition her husband to the hospital and then back home. (*Id.*). Plaintiff took another FMLA day on May 11, 2012, due to her own health condition and to care for her husband after he collapsed again and she aggravated her back injury. (*Id.*, ¶ 8).

Plaintiff asserts that prior to May 11, 2012, Rose had approved FMLA leave for May 17, 2012, because plaintiff planned to take her husband to see his specialist. (*Id.*, ¶ 9). Plaintiff states that she received word after May 11, 2012, that her FMLA leave day on May 17, 2012, had been rescinded and she would be scheduled to work. (*Id.*). Defendant disputes plaintiff's allegations. Defendant relies on a "Request for Paid Time Off" form plaintiff submitted for that date, which defendant alleges shows that plaintiff requested May 17 off as PTO, not FMLA leave. (Doc. 26 at 3; Doc. 24-7). The form in question is a "Request for Paid Time Off" form which plaintiff completed and dated April 16, 2012. (Doc. 24-7). Plaintiff indicated on the form that she was requesting 22.5 hours PTO for three dates: May 11, 17 and 19, 2012. (*Id.*). Plaintiff apparently indicated that she was requesting FMLA leave on May 17, 2012, by writing "FMLA" next to that date. (*Id.*). Rose appears to have interpreted the request as one for FMLA leave for all three days. Rose wrote a note on the bottom of the page stating that she would need a statement from plaintiff's doctor "[due to] all of these days being required off due to FMLA - that you or your husband were seen on these days (or have a scheduled procedure.)." (*Id.*). On April 30, 2012, plaintiff responded with a note clarifying that she was "only asking for 3 days off," which equaled 22.5 hours, and that she was requesting FMLA leave on May 17, 2012. (Doc. 24-8). Plaintiff asked Rose to let her know if Rose still needed a statement from the doctor for May 17, 2012. (*Id.*). Rose responded as follows: "The 11th [and] 19th are being denied.

4

You must have PTO hours available and you will only have enough [hours] for 1 day 5-17-12 FMLA." (*Id.*). Rose and Bock subsequently informed plaintiff in writing on May 11, 2012, that: "As of today 5-11-12, you will not have enough PTO hours accrued by 5-17-12 to take that day off as PTO. Therefore, you will be scheduled to work on Thursday 5-17-12 (3P-11P)." (Doc. 24-9). Plaintiff was directed to see Bock if she had any questions. (*Id.*).

### D. Beechwood employee handbook/substance and alcohol abuse policy

An employee handbook was in effect for Beechwood employees at all relevant times. (*See* Doc. 17, Meents Depo., Exh. 9). The employee handbook was revised in November 2011. (*Id.*). Plaintiff received a copy of the employee handbook with the revision date of November 2011 in January 2012 (hereafter, "employee handbook"). (Doc. 25, Meents Aff., ¶ 14; Doc. 17-2, Meents Depo. at 115). Plaintiff signed a receipt acknowledging that she received the employee handbook on January 19, 2012. (Doc. 17-2, Meents Depo. at 114-15; Doc. 17, Exh. 16). This is the only time plaintiff recalls signing an acknowledgement for receipt of a drug-free workplace policy. (Doc. 17-2, Meents Depo. at 115).

The employee handbook includes a "Drug and Alcohol Abuse Policy" (hereafter, "Policy"). (Doc. 17, Exh. 9, p. 26). The Policy states that Beechwood "cannot condone and will not tolerate behaviors on the part of employees that relate to substance use, such as . . . 2. Misuse of alcohol or prescription medication; . . . [or] 4. Arrival or return to work under the influence of any drug (legal or illegal) or alcohol to a degree that could affect job performance." (*Id.*). The Policy further states that defendant has "zero tolerance for substance use," that anyone found in violation of the Policy "will be held responsible for non-compliance with the Policy," and that "[d]iscipline including discharge will apply to employees who violate the Policy." (*Id.*).

5

The Policy sets out a number of protections that are built into the program for the

employee, including the following:

- The designation of a Medical Review Officer (MRO) by Beechwood, who is a "trained physician responsible for checking whether there is a valid reason for the presence of the substance in the employee's system."
- An assurance that "[w]hen the MRO receives positive test results, the MRO will contact the employee and any appropriate health care provider to determine whether there is a valid reason for the presence of the drug in the person's system."
- The provision of a two-step testing program consisting of an initial screening test and, if the initial test results are positive, a second test.
- The establishment of cut-off levels established from federal guidelines and applicable to all employees for each drug and for alcohol "for what will be considered a positive test," above which an employee "has enough substance in their system to affect workplace safety and their ability to perform their job."

(*Id*. at 27).

The Policy states that every employee will attend an information session at which the

Policy is explained, every employee will receive a copy of the Policy, and every employee is

expected to acknowledge its receipt. (*Id*.). The Policy stresses that "Beechwood Home will

terminate based on a positive test." (*Id*. at 28). The Policy explains that employees will be

tested when "management has reason to suspect that an employee may be in violation of this

Policy." (*Id*.). The Policy further explains that a reasonable suspicion test may occur based on

"1. Observed behavior, such as direct observation of drug/alcohol use or possession and/or

physical symptoms of drug/alcohol use; . . . [or] 4. Information provided either by reliable and

credible sources or independently corroborated regarding an employee's substance use[.]" (*Id*. at

27-29).

The Policy sets out the following testing procedure:

- An initial screening test. If this is negative, a negative test is declared.
- A confirmatory test if the initial test is "positive (comes in at or higher than the cut-off level)"

6

- Breath alcohol testing will be conducted only by a medical clinic that uses only certified equipment and personnel. "Breath alcohol concentrations exceeding .04 will be considered a verified positive result."
- If there is a positive test result under the Policy, the employee will be given the opportunity to explain the findings to the MRO prior to the issuance of the positive test result to Beechwood. Upon receipt of a confirmed positive finding, the MRO will attempt to contact the employee by telephone or in person to inform her of the positive test result and allow her an opportunity to rebut or explain the findings.
- All test results will be reported to the MRO before they are issued to Beechwood. Beechwood will receive a summary of the MRO's report. All of these procedures are intended to be consistent with federal guidelines for MROs published by the Federal Department of Health and Human Services.
- Employees who "are found to have a confirmed positive drug or alcohol test will be immediately terminated."

(*Id.* at 29-31).

According to defendant, the employee handbook described a "zero tolerance policy for alcohol or drug use" which was in effect at Beechwood at all relevant times. (Doc. 20-1, Antwi-Bokaye Aff., ¶ 6; Doc. 18-1, Zwick Aff., ¶ 10). Defendant alleges that the "zero tolerance policy" was made known at in-service meetings all employees attended. (Doc. 20-1, Antwi-Bokaye Aff., ¶ 6; Doc. 21-1, Senior Aff., ¶ 6; Doc. 18-1, Zwick Aff., ¶ 7). Zwick alleges that the "zero tolerance policy as communicated to the employees was not affected by any other language in Beechwood's policy regarding minimum limits or thresholds." (Doc. 18-1, Zwick Aff., ¶ 11).

Defendant issued a Drug and Alcohol Policy with a revision date of April 2012 (hereafter, "Revised Policy"). (Doc. 21-1, Senior Aff., ¶ 14; Exh. C). The actual date of the revision and the date the Revised Policy was  distributed to employees is not clear from the record. The Revised Policy lowered the blood alcohol concentration cutoff from .04 to .01, stating that "[b]reath alcohol concentrations exceeding .01 will be considered a verified positive result." (Doc. 21-1, Exh. C, p. 29). Although Zwick had no role in the distribution of Beechwood's personnel policies to employees, she alleges that Beechwood employees, and

7

specifically Senior, were instructed to provide employees with the revised policies on the revision dates listed on the policies. (Doc. 18-1, Zwick Aff., ¶ 8). Zwick alleges that "Changed Policies that were not a complete revision to the Employee Handbook would not necessarily result in an employee acknowledgement being signed." (*Id.*, ¶ 9). However, the terms of the Revised Policy state that every employee will attend an information session in which the policy is explained; the employee will have an opportunity to ask questions; and "Everyone will receive a copy of the Policy, and everyone is expected to acknowledge its receipt." (Doc. 21-1, Senior Aff., Exh. C, p. 27). Plaintiff denies that she received a copy of the Revised Policy dated April 2012 prior to her discharge. (Doc. 25, Meents Aff., ¶ 14). Plaintiff also denies that she was ever informed that defendant's alcohol policy differed from the one set forth in the November 2011 employee handbook. (*Id.*, ¶ 15).

### E. The May 15, 2012 incident

On May 15, 2012, shortly before beginning her 3:00 p.m. shift, plaintiff went to Bock's office and told Bock that she needed to take May 17, 2012 off as an FMLA day. (Doc. 17-2, Meents Depo. at 145-46). According to plaintiff, Bock responded that plaintiff did not have sufficient PTO to take FMLA leave. (*Id.* at 146-147). At approximately 3:15 p.m., after plaintiff had clocked in, Rose and Senior came into plaintiff's "med room" and they discussed plaintiff's request. (*Id.* at 148-49). According to plaintiff, she informed them that she was willing to take the day off without pay, but they responded she needed PTO time. (*Id.* at 149). Following the conversation, plaintiff called the doctor's office and cancelled her husband's appointment scheduled for May 17, 2012. (*Id.* at 150). Approximately 30 minutes later, Rose informed plaintiff that someone had smelled alcohol on her breath and she had to go to Concentra to be tested. (Docs. 17-2, 17-3, Meents Depo. at 150-51, 159). Concentra had plaintiff take a breath

8

alcohol test. (Doc. 17-3, Meents Depo. at 152). The technician who conducted the test informed plaintiff there was no need to worry because she had "passed the test," and the technician did not perform a second confirmatory test. (*Id*. at 154-55; Doc. 25, Meents Aff., ¶ 17). The technician handed the results to plaintiff, and plaintiff gave the results to the Beechwood employee who had driven her to Concentra. (Doc. 17-3, Meents Depo. at 153). The test results showed a breath alcohol level of .018. (Doc. 17, Meents Depo., Exh. 30). When plaintiff got home that day, she looked in her employee handbook and saw that the cutoff listed in her handbook for a positive result was .04. (Doc. 17-3, Meents Depo. at 155).

Rose consulted Zwick to confirm that since plaintiff had tested positive for alcohol she should be terminated, and Zwick agreed. (Doc. 18-1, Zwick Aff., ¶ 14). Zwick states that plaintiff called her the day after her positive test result and admitted to Zwick that on the day she was sent to Concentra and was tested "she had an early dinner with her husband before she came to work and had an alcoholic beverage." (*Id*., ¶ 16). Plaintiff states that she consumed alcohol at 11:30 p.m. on May 14, 2012, more than 15 hours before the start of her shift, during an anniversary celebration dinner with her husband. (Doc. 25, Meents Aff., ¶ 12). Plaintiff denies that she was "under the influence of alcohol" when she arrived for her 3:00 p.m. shift on May 15, 2012. (*Id*., ¶ 13). Plaintiff further alleges that although she spoke to Bock on May 15, 2012, she did not get closer than to within 15 feet of her. (*Id*., ¶ 11).

On May 16, 2012, Senior informed plaintiff that she was terminated. (Doc. 17-3, Meents Depo. at 165). Plaintiff subsequently received a letter from Rose dated May 16, 2012, informing her that she had been sent to Concentra because there was "reasonable suspicion of alcohol on [her] breathe [sic]"; the breathalyzer confirmed the presence of alcohol; the Beechwood policy states that "[e]mployees who are found to have a confirmed positive drug or alcohol test will be

immediately terminated"; and plaintiff was being terminated effective immediately for violating defendant's Drug and Alcohol Policy. (Doc. 17, Meents Depo., Exh. 32).

Plaintiff wrote a letter to Zwick dated May 31, 2012, appealing her termination. (Doc. 17-3, Meents Depo. at 174-76; Meents Depo., Doc. 23-1, Exh. 36). Plaintiff acknowledged that according to the employee handbook, employees with a "confirmed positive alcohol test will be immediately terminated"; however, her test result was .018, and a breath alcohol concentration exceeding .04 would be considered a "verified positive result" according to the employee handbook. (*Id*.). Zwick wrote in response that the policy states that Beechwood has "zero tolerance for substance use," that "[e]mployees who are found to have a confirmed positive drug or alcohol test will be immediately terminated," and that "[b]reath alcohol concentrations exceeding .01 shall be considered verified positive result [sic]." (Meents Depo., Doc. 23-2, Exh. 37). Zwick explained to plaintiff that she was afforded her right to explain the findings to the MRO when the test was conducted and before the positive test result was issued to Beechwood. (*Id*.). Zwick stated that she was upholding plaintiff's termination and that plaintiff had seven days to submit any additional medical information explaining why her breath alcohol test was positive, at which time Zwick would reconsider the evidence. (*Id*.). Plaintiff submitted a letter dated June 18, 2012, listing a number of factors other than alcohol ingestion, including acid reflux, that allegedly could have contributed to the .018 reading. (Meents Depo., Doc. 23-6, Exh. 41). Plaintiff attached a letter from her physician stating that she was being treated for acid reflux and was taking medication for the condition. (*Id*.). Zwick upheld the termination on the grounds that: (1) if there were any medical or other issues of which plaintiff was aware that could have produced a false positive result, she could have brought those issues to the attention of the Concentra physician staff so the issues could have been verified immediately; and (2)

10

plaintiff had not provided any additional relevant information which would confirm that her blood alcohol levels were increased due to factors other than alcohol. (Meents Depo., Doc. 23-8, Exh. 43).

### III.  Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  The Court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).  However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289).  If the evidence is merely colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, summary judgment may be granted. *Anderson*, 477 U.S. at 249.

## IV. The FMLA

Plaintiff claims that she was terminated from her position at Beechwood in retaliation for exercising her rights under the FMLA.  Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . (C) In order to care for the spouse . . . of the employee, if such spouse . . . has a serious health condition[]" or "(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1).  The FMLA defines the term "serious health condition" to mean "an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  "An eligible employee may elect, or an employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or medical or sick leave of the employee for leave provided under [§ 2612(a)(1)(C) or (D)] for any part of the 12-week period of such leave under such subsection. . . ."  29 U.S.C. § 2612(d)(2)(B).

The "retaliation" or "discrimination" theory of liability under the FMLA arises under 29 U.S.C. § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for "opposing any practice made unlawful by" the Act.  *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003)).  An employer is prohibited from discriminating against an employee who has used FMLA leave and cannot use the taking of FMLA leave as a negative factor in employment actions.  *Arban*, 345 F.3d at 403 (citing 29 C.F.R. § 825.220(c)).  This prohibition extends to retaliatory discharge of an employee for taking FMLA leave.  *Id.* (citing *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

12

In FMLA cases that rely upon indirect evidence, the Court applies the three-step
framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bryson*, 498
F.3d at 570. "[T]he plaintiff's burden is merely to present evidence from which a reasonable
jury could conclude that the plaintiff suffered an adverse employment action under
circumstances which give rise to an inference of unlawful discrimination." *Id.* (quoting *Macy v.
Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007), *abrogated on other gds. by
Lewis Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (internal quotation marks
and citation omitted)). A plaintiff may establish a prima facie case of retaliatory discharge under
the FMLA by showing that "(1) [s]he engaged in protected activity, (2) h[er] employer was
aware of the protected activity, (3) [s]he was subject to an adverse employment action, and (4)
there was a causal nexus between the protected activity and the adverse employment action."
*Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 432-33 (6th Cir. 2014) (citing
*Donald v. Sybra, Inc.*, 667 F.3d 757, 761-62 (6th Cir. 2012)). In order to establish a causal link,
the plaintiff must present evidence "sufficient to raise the inference that her protected activity
was the likely reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898
F.2d 1127, 1135 (6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.
1982)).

If the plaintiff satisfies her prima facie showing, the burden shifts to the defendant to
offer evidence of a legitimate, non-retaliatory reason for the adverse employment action.
*Bryson*, 498 F.3d at 570 (citing *Macy,* 484 F.3d at 364). If the defendant does so, the burden
shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful
retaliation. *Id.* (citing *Macy,* 484 F.3d at 364). At the pretext stage, the Court considers whether
the plaintiff has adduced evidence which would enable the factfinder to conclude that the

13

employer's stated reason for terminating her "is not the true reason and is simply a pretext for unlawful retaliation." *Id*. at 572.   A plaintiff may show pretext by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Tillman v. Ohio Bell Tel. Co.*, 545 F. App'x 340, 349 (6th Cir. 2013) (citations omitted). "[T]he employer's motive is an integral part of the analysis" in an FMLA retaliation claim. *Demyanovich*, 747 F.3d at 432-33 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (emphasis omitted)). *See also Bryson*, 498 F.3d at 572 (retaliation claims turn on the employer's motive for discharging the plaintiff) (citing *Edgar*, 443 F.3d at 508, 512).

Where the plaintiff disputes that there was no basis in fact for her discharge, she cannot establish pretext simply because the reason for her discharge was ultimately shown to be incorrect "as long as an employer has an honest belief in its proffered non-discriminatory reason[.]" *Tillman*, 545 F. App'x at 349 (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001); *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) ("so long as the employer honestly believed in the proffered reason given for its employment action, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.")).   When the defendant invokes the "honest belief" rule, "the plaintiff must allege more than a dispute over the facts upon which [her] discharge was based. [S]he must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Id*. (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (citing *Smith*, 155 F.3d at 806-07).   To determine whether the defendant had an "honest belief" in the proffered basis for the employee's discharge, the Court examines whether the defendant has established

14

"'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Id.* (quoting *Abdulnour v. Campbell Soup Supply Co.,* 502 F.3d 496, 502-03 (6th Cir. 2007); *Braithwaite,* 258 F.3d at 494). In making this determination, it is not necessary that the employer's decisional process "be optimal" or that the employer "left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Smith,* 155 F.3d at 807).

The law in the Sixth Circuit holds that proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection. *Bryson*, 498 F.3d at 571 (evidence of a causal connection found where the plaintiff was discharged three months after he requested FMLA leave and on the day he was scheduled to return to work) (citing *Skrjanc,* 272 F.3d at 314; *Chandler v. Specialty Tires of Am.,* 283 F.3d 818, 826 (6th Cir. 2002) (stating that in the FMLA context, "[p]roximity in time can raise a prima facie case of retaliatory discharge")). *See also Bell v. Prefix, Inc.*, 321 F. App'x 423, 426-27 (6th Cir. 2009) ("the close temporal proximity between [the plaintiff's] leave and his termination in this case suffices for the showing of causal connection necessary at this stage of the inquiry") (citing *Skrjanc,* 272 F.3d at 314). However, "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Donald*, 667 F.3d at 763 (citing *Skrjanc,* 272 F.3d at 317). Nonetheless, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Bell*, 321 F. App'x at 431 (quoting *DeBoer v. Musashi Auto Parts, Inc.,* 124 F. App'x 387, 393-94 (6th Cir. 2005)).

15

## V. Motion for summary judgment

Defendant contends that it is entitled to summary judgment as a matter of law on plaintiff's FMLA retaliation claim. (Doc. 16).  Defendant alleges that plaintiff cannot establish a prime facie case of FMLA retaliation because she cannot show there was a causal connection between her use of FMLA leave and her discharge.  (*Id*. at 14-15).  Defendant alleges that it required plaintiff to take an alcohol breath test in accordance with the terms of its employee handbook; it had an honest belief that the test was required; it terminated plaintiff only after it learned that the result of the alcohol test was "positive" in accordance with the terms of the "zero tolerance policy" of the recently revised employee handbook, which purportedly was in effect at the time and established a .01 reading for a positive alcohol test; and it consulted Strunk, who had no hiring or firing authority, about the test and she agreed that plaintiff should be terminated. (*Id*.).  Defendant further alleges that assuming plaintiff could establish a prima facie case of FMLA retaliation, it has articulated a legitimate non-retaliatory reason for plaintiff's discharge - the positive alcohol test - and plaintiff cannot show as a matter of law that the articulated reason is a pretext for retaliation.  (*Id*.).  Defendant alleges that the termination had a basis in fact; the positive test was clearly sufficient motivation for the discharge; and the positive test motivated the termination.  (*Id*. at 15-16).

Plaintiff argues in response that the first three prongs of a prima facie case of FMLA retaliation are not disputed and that she has come forward with sufficient evidence to establish the fourth causation prong.  (Doc. 24 at 12-18).  Plaintiff asserts that there is evidence of a close temporal proximity between her protected FMLA activity and defendant's decision to discharge her, which is sufficient under the facts of this case to establish a causal connection.  (*Id*. at 12).  Plaintiff argues that there is additional evidence of a causal connection, including evidence that

defendant's management saw her absences as a major problem and an inconvenience to fellow workers; evidence that defendant required her to provide a note from her doctor to prove her FMLA eligibility in May 2012, which defendant had not previously required of her and which it did not require of its other employees; and evidence that defendant denied plaintiff's request to take a day of FMLA leave on May 17, 2012. (*Id*. at 12-13). Further, plaintiff argues that FMLA retaliation was the more likely reason for her discharge as evidenced by defendant's numerous deviations from its Drug and Alcohol Policy in her case. (*Id*. at 15-16). Plaintiff alleges that the "honest belief" rule does not apply here to preclude her from establishing pretext because it is apparent from the terms of the written policy in effect at the time of her discharge, as well as the terms of the subsequently revised policy, that plaintiff's discharge was not mandated under the alleged "zero tolerance" provisions of the policies. (*Id*. at 16-17). Plaintiff argues that at the very least this is a question for the trier of fact. (*Id*. at 17).

**VI. Defendant is not entitled to summary judgment.**

### A. Prima facie case

Plaintiff has come forward with sufficient evidence to create a genuine issue of material fact on her prima facie case of retaliation under the FMLA. Defendant does not dispute that the first three prongs of a prima facie case of FMLA retaliation are established: (1) plaintiff engaged in protected activity by using and requesting FMLA leave; (2) defendant was aware of plaintiff's use of FMLA leave and her FMLA leave requests; and (3) defendant subjected plaintiff to an adverse employment action by terminating her. *See Demyanovich*, 747 F.3d at 432-33. Defendant disputes that plaintiff has produced sufficient evidence to establish a causal connection between her protected activity and the adverse employment action so as to establish the fourth prong of her prima facie case. (Doc. 16 at 14). Construing all disputed facts and

17

drawing all reasonable inferences in plaintiff's favor, the Court finds there is sufficient evidence of a causal connection between plaintiff's protected activity and her termination to establish this element of a prima facie case of FMLA retaliation.

The record shows that plaintiff may have taken multiple days of FMLA leave in both February and March 2012. (Doc. 25, Meents Aff., ¶ 6). Plaintiff also submitted a request dated April 16, 2012, to take a day of FMLA leave on May 17, 2012. (Doc. 24-7). Plaintiff clarified her request in a note to Rose dated April 30, 2012. (Doc. 24-8). Rose required plaintiff to submit a note from her doctor to verify her need for FMLA leave (*Id.*), which was inconsistent with defendant's practice of not requiring employees to provide justification for FMLA leave. Rose and Bock then informed plaintiff in a written statement dated May 11, 2012, that she would be scheduled to work on May 17, 2012. (Doc. 24-9). Although there are many factual issues surrounding plaintiff's leave request and defendant's response to the request, a reasonable fact-finder could determine from plaintiff's testimony and this documentary evidence that in April 2012 plaintiff made a request to take FMLA leave on May 17, 2012 (Doc. 24-7); after advising plaintiff that she would need to verify the need for FMLA leave (*Id.*), defendant informed plaintiff in writing on May 11, 2012, that she would be scheduled to work on May 17, 2012 (Doc. 24-9); and plaintiff went to Bock's office before the start of her shift on May 15, 2012, and told Bock that she needed to take FMLA leave on May 17, 2012. (Doc. 17-2, Meents Depo. at 145-46). Plaintiff was terminated just hours after her conversation with Bock on May 15, 2012. The very close temporal proximity between plaintiff's protected activity and her termination, coupled with evidence indicating that defendant opposed plaintiff's FMLA leave request for May 17, 2012, is sufficient to establish a causal connection between plaintiff's FMLA leave and her discharge for purposes of plaintiff's prima facie case.

18

**B. Pretext**

Defendant has articulated a legitimate, non-retaliatory reason for plaintiff's discharge, which is that plaintiff violated defendant's "zero tolerance" Drug and Alcohol Policy. Plaintiff alleges that she can demonstrate the reason proffered by defendant is a pretext for FMLA retaliation because (1) she did not violate the Drug and Alcohol Policy that applied to her, and (2) defendant deviated from its own policy to such a degree that a reasonable fact-finder could conclude that the reason proffered for her discharge is pretextual. (Doc. 24 at 16-17). The Court finds for the reasons explained below that plaintiff has come forward with sufficient evidence to enable a reasonable fact-finder to conclude that defendant's stated reason for terminating her "is not the true reason and is simply a pretext for unlawful retaliation." *See Bryson*, 498 F.3d at 572.

Initially, the Court finds there are questions of fact as to whether plaintiff violated Beechwood's Drug and Alcohol Policy because it is not clear from the record which policy was in effect at the time of plaintiff's discharge. Prior to plaintiff's discharge, Beechwood had distributed the employee handbook with a revision date of November 2011. (*See* Doc. 17, Meents Depo., Exh. 16). The employee handbook included a Drug and Alcohol Policy with a breath alcohol concentration cutoff of .04 for a positive test result. (*Id*., Meents Depo., Exh. 9). There is no dispute that plaintiff was made aware of this Policy and had acknowledged receipt of the Policy. After plaintiff's discharge, defendant produced the Revised Policy with a revision date of April 2012, which included a breath alcohol concentration cutoff of .01. (Doc. 21-1, Senior Aff., Exh. C). There is no evidence in the record as to the actual date the Revised Policy was written or the date the Revised Policy went into effect. Further, although defendant has introduced testimony that its practice was to "always" distribute a revised policy to employees in the same month the policy was revised (Doc. 21-1, Senior Aff., ¶ 13), there is no evidence that

this particular policy was ever distributed to employees. To the contrary, plaintiff denies that she ever received a copy of the Revised Policy dated April 2012. (Doc. 25, Meents Aff., ¶ 14). Moreover, there is no evidence that plaintiff or any other employee acknowledged receipt of the Revised Policy. Zwick asserts that the absence of an acknowledgement was consistent with company practice because "[c]hanged Policies that were not a complete revision to the Employee Handbook would not necessarily result in an employee acknowledgement being signed." (Doc. 18-1, Zwick Aff., ¶ 9). However, the practice described by Zwick appears to be inconsistent with the terms of the Revised Policy itself, which states that "[e]veryone will receive a copy of the Policy, and everyone is expected to acknowledge its receipt." (Doc. 21-1, Exh. C, p. 27). The Revised Policy also states that every employee will attend an information session in which the policy is explained and the employee will have an opportunity to ask questions. (Id.) However, plaintiff denies that she was ever informed that defendant's alcohol policy differed from the one set forth in the November 2011 Policy (Doc. 25, Meents Aff., ¶ 15), and there is no evidence that the April 2012 policy revision was actually announced or explained to employees. These disputed factual issues preclude a finding on summary judgment that the April 2012 Revised Policy applied to plaintiff. Rather, a reasonable jury could conclude that the April 2012 Revised Policy had not yet gone into effect as of May 15, 2012, and that the November 2011 Policy was still in force as of that date.

Construing the disputed facts and the inferences to be drawn therefrom in plaintiff's favor, a reasonable jury could further find that plaintiff did not violate the terms of the November 2011 Policy because her breath alcohol concentration level of .018 did not exceed the cutoff of .04 for a "positive" test result set forth in the Policy; defendant nonetheless applied a stricter policy with a .01 cutoff for a positive test result to plaintiff without ever advising her or any

other employee of the stricter policy terms; and defendant's after-the-fact application of the

stricter Drug and Alcohol Policy terms in the Revised Policy, when considered in conjunction

with the close temporal proximity between plaintiff's protected activity and discharge, was a

pretext for FMLA retaliation.

Defendant disputes that application of the April 2012 Revised Policy to plaintiff can be

considered evidence of pretext. Defendant argues that regardless of whether the November 2011

Policy or the April 2012 Revised Policy applied to plaintiff, her discharge was warranted as of

May 2012 under defendant's "zero tolerance" alcohol policy. (Doc. 26 at 10-11). Defendant

alleges that its "clear and unequivocal position . . . in May of 2012 was that <u>any positive test for</u>

<u>alcohol</u> was a violation of its zero tolerance alcohol policy," and Concentra was responsible for

making the medical judgment as to whether an individual tested positive for alcohol. (Doc. 26 at

10-11, 14) (emphasis in original). Yet, construing the evidence in plaintiff's favor, defendant did

not defer to Concentra's judgment in plaintiff's case. According to plaintiff's evidence,

Concentra determined that plaintiff had not tested positive for alcohol because she tested below

the cutoff level; therefore, Concentra did not perform a second "confirmatory test." (Doc. 25,

Meents Aff., ¶ 17). Defendant nonetheless found that plaintiff had tested positive for alcohol and

had therefore violated its alcohol policy.

Defendant's argument also misconstrues the express terms of both the November 2011

Drug and Alcohol Policy and the April 2012 Revised Policy, which define the "Policy" as "[a]

written policy (this policy) that clearly defines the program rules and explains its benefits to

employees." (Doc. 24-11, November 2011 Policy, p. 25; Doc. 21-1, Exh. C, April 2012 Revised

Policy, p. 26). Defendant ignores the critical fact that the policies define a "positive test for

alcohol" differently. Both policies provide that "[c]ut-off levels for each drug and for alcohol are

established for what will be considered a positive test." (Doc. 24-11, November 2011 Policy, p. 29; Doc. 21-1, Senior Aff., Exh. C, April 2012 Revised Policy, p. 29). Both policies define a "positive" test as one which initially "comes in at or higher than the cut-off level." (Doc. 24-11, November 2011 Policy, p. 29; Doc. 21-1, Exh. C, April 2012 Revised Policy, p. 29). However, the November 2011 policy defines a "verified positive result" as a breath alcohol concentration exceeding .04 (Doc. 24-11, p. 29), whereas the April 2012 Revised Policy defines a "verified positive result" as a breath alcohol concentration exceeding .01 (Doc. 21-1, Exh. C, p. 29). Thus, plaintiff's breath alcohol concentration of .018 did not exceed the cutoff of .04 established in the November 2011 policy, it did not constitute a "verified positive result" under that policy, and it should have resulted in the declaration of a "negative test" at the initial screening level with no further testing or negative employment consequences pursuant to the plain terms of that policy. (Doc. 24-11, p. 29).

Even assuming the April 2012 Revised Policy was properly applied to plaintiff, a reasonable fact-finder could find that defendant failed to abide by the terms of that policy and construe such failure as evidence of pretext under the facts of this case. The Sixth Circuit has recognized that the failure to follow internal disciplinary procedures can constitute evidence of discrimination. *Talwar v. Catholic Healthcare Partners*, 258 F. App'x 800, 806 (6th Cir. 2007) (citing *Durante v. Ohio Civil Rights Comm'n*, No. 88-3502, 1990 WL 68856, at *3 (May 24, 6th Cir. 1990) ("Evidence of disparate application of disciplinary procedures in the termination decision is merely evidence relevant to the ultimate question of discriminatory discharge."); *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006) (suggesting that failure to adhere to internal disciplinary procedures may constitute evidence of discrimination)).

22

Here, there is evidence that defendant ignored detailed procedures delineated in its Drug and Alcohol Policy for the express purpose of protecting its employees. (Doc. 24-11, November 2011 Policy, p. 27; Doc. 21-1, Exh. C, April 2012 Revised Policy, p. 27). These procedures include: (1) the designation of "a Medical Review Officer (MRO) who is a trained physician responsible for checking whether there is a valid reason for the presence of the substance in the employee's system"; (2) performance of a second "confirmatory test," which is a different test than the first test, for confirming the employee's test results; and (3) a requirement that the MRO contact the employee to determine whether there was a valid reason for the presence of the substance. (Doc. 24-11, November 2011 Policy, pp. 27-29; Doc. 21-1, Exh. C, April 2012 Revised Policy, pp. 27-29). There is evidence to support a finding that in plaintiff's case, defendant designated an MRO who was not a trained physician, a second confirmatory test was never performed, and an MRO did not contact plaintiff to determine if there was a valid reason for the presence of alcohol in her system; to the contrary, according to plaintiff, the technician who conducted the test informed her that there was no cause for concern because the test result was negative. (Doc. 17-2, Meents Depo. at 154-55; Doc. 25, Meents Aff., ¶ 17). Defendant attributes any failure to abide by these procedures to Concentra and argues that it cannot be held liable for FMLA retaliation as a matter of law based on Concentra's omissions because the evidence shows defendant reasonably believed plaintiff had tested positive for alcohol. (Doc. 26 at 12-14). Defendant further contends that any deviations from its own internal policies cannot be construed as evidence of pretext because "there is nothing implausible about [its] explanation that it relied on Concentra to properly administer the testing protocol." (Doc. 26 at 14). However, a reasonable jury could reject defendant's explanation that plaintiff had tested "positive" for alcohol and question why defendant failed to provide plaintiff the protections

23

expressly provided under its own Drug and Alcohol Policy before deciding to discharge her. A jury could reject defendant's explanation that it was relying on a third-party entity to "properly administer the testing protocol" outlined in defendant's policy (*see Id.*), and construe its failure to follow its internal procedures designed for its employees' protection as evidence of pretext.

Thus, the Court finds that there are many unresolved factual matters presented by the record on summary judgment which go to the issue of pretext. These factual questions relate to plaintiff's request for FMLA leave on May 17, 2012 and defendant's response; whether plaintiff violated defendant's Drug and Alcohol Policy in effect at the time of her discharge; whether defendant applied a harsher Drug and Alcohol Policy to plaintiff than was actually in effect or which had been disclosed to employees prior to May 15, 2012; and whether defendant failed to follow its own internal disciplinary procedures in a number of material respects. The evidence plaintiff has produced on these issues, together with the very close temporal proximity between plaintiff's protected activity and discharge, are sufficient to raise a genuine issue of material fact to whether plaintiff's violation of defendant's Drug and Alcohol Policy was the true reason for her termination or whether it was a pretext for FMLA retaliation.

## VII. Conclusion

Plaintiff has come forward with sufficient evidence to establish a prima facie case of FMLA retaliation. Although defendant has articulated a legitimate, non-retaliatory reason for the termination decision, a reasonable jury could find the proffered decision to be a pretext for FMLA retaliation. Defendant therefore is not entitled to summary judgment as a matter of law on plaintiff's retaliation claim brought under the FMLA.

**IT IS THEREFORE ORDERED THAT:**

Defendant's motion for summary judgment (Doc. 16) is **DENIED**.

Date:  1/2/15

Karen L. Litkovitz
United States Magistrate Judge